**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDTRONIC, INC., ET AL, | |
| Plaintiff, | No. 06-04455 JSW |
| v. | **ORDER DENYING W.L. GORE AND ASSOCIATES, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| W.L. GORE & ASSOCIATES, INC., | |
| Defendants. | |

## INTRODUCTION

Now before the Court for consideration is the Motion for Summary Judgment of Patent Invalidity filed by Defendant W.L. Gore & Associates, Inc ("Gore"). Having considered the parties' papers, relevant legal authority, the record in this case, and having had the benefit of oral argument, the Court HEREBY DENIES the motion for summary judgment.[1]

## BACKGROUND

Plaintiffs, Medtronic, Inc., Medtronic USA, Inc., and Medtronic Vascular, Inc. (collectively "Medtronic"), allege that Gore infringes Medtronic's U.S. Patent Nos. 5,067,957 ("the '957 Patent"), 5,190,546 ("the '546 Patent"), and 6,306,141 ("the '141 Patent") (collectively, "the Jervis Patents").[2] Medtronic also alleges that Gore infringes Medtronic's

---

[1] The Court notes that the parties each have violated Northern District Civil Local Rule 3-4(c)(2), which requires footnotes to be in 12 point font. The parties are HEREBY ADVISED that failure to comply with this rule in the future shall result in the Court striking papers from the record.

[2] Medtronic asserts that Gore infringes claims 1-3, 5-7, 9-16, 18, 22, 24, 37 and 40 of the '957 Patent, claim 27 of the '546 Patent, and claims 1-7, 9, 18-19, and 22 of the '141 Patent. (Declaration of Ellen J. Wang ("Wang Decl."), Ex. B at 8:7-8, 13:4-5, 17:22-23.)

U.S. Patent Nos. 4,886,062 ("the '062 Patent"), 6,656,219 ("the '219 Patent"), and 6,923,828 ("the '828 Patent") (collectively, "the Wiktor Patents").[3] The Jervis and Wiktor Patents each are directed, in general, to medical devices or methods for implanting such medical devices into a human body.

Gore moves for summary judgment on the basis that: (1) all asserted claims of the Wiktor Patents are invalid for lack of enablement; (2) all asserted claims of the Jervis Patents are invalid, because the claims are obvious in view of the prior art; and (3) all asserted claims of the Jervis Patents are invalid, because the claims are indefinite.

**A.  The Wiktor Patents.**

The Wiktor Patents are directed to intravascular stents. In the specification, Wiktor describes his invention, generally, as comprising "an open-ended wire formed device of basically cylindrical shape and made of a softer-then [*sic*] spring type metal and fitted over an inflatable element of a typical balloon type catheter. ... The wire formed device is intended to act as a permanent prosthesis stent and is implanted transluminarely." (*See, e.g.,* Declaration of Jennifer BianRosa ("BianRosa Decl."), Ex. A ('062 Patent at 1:14-22).)[4] The '062 Patent was filed on October 19, 1987, and the '219 and '828 Patents each were filed on November 22, 2000. (Bianrosa Decl., Exs. A-C.)[5] It is undisputed that, at the time the '062 Patent was filed, a person of ordinary skill in the art would have a degree in engineering or biomedical engineering and familiarity with implantable medical devices.

Claim 5 of the '062 Patent, which is representative of the asserted claims of that patent, provides:

---

[3] Medtronic asserts that Gore infringes claims 5-7, 9-10, and 12-13 of the '062 Patent, claims 1, 3-4, 6-7 and 9 of the '219 Patent, and claims 1, 3-14, and 18-21of the '828 Patent. (*See* Wang Decl., Ex. B at 1:16-17, 3:15-16, 5:15-16.)

[4] The Court cites to references within the patents-in-suit in the following format: "column:line" or "column:line-column:line."

[5] The '219 and '828 Patents are continuations-in-part of the '062 Patent. Thus, although the specifications of each of the patents are largely similar, the specifications of the '219 and '828 Patents contain new matter. When the Court cites portions of the specification that are common to all three patents, it shall cite only to the '062 Patent.

2

> A radially-expandable stent for implantation within a body vessel comprising:
>
> a stent body having a wall of generally cylindrical shape formed of a helical coil made of a wire, the body having a longitudinal axis and a first diameter;
>
> zig-zag means in the wire for allowing radial expansion of the cylindrical stent body from the first diameter to a second larger diameter without significantly altering the body length along the longitudinal axis.

('062 Patent at 5:42-6:7.)

Claim 1 of the '219 Patent, which is representative of the asserted claims of that patent, provides:

> An intravascular stent, comprising:
>
> a continuous sinusoidal shaped wire, wherein said wire is coiled to form a helical-shaped stent body, wherein said stent is expandable from a first delivery diameter to a second implanted diameter.

(BianRosa Decl., Ex. B ('219 Patent at 8:2-7).)

Claim 1 of the '828 Patent, which is representative of the asserted claims of that patent, provides:

> An intravascular stent, comprising:
>
> a generally cylindrical body including a helically coiled wire, wherein said helically coiled wire has generally sinusoidally-shaped waves;
>
> wherein said generally cylindrical body is capable of radially expanding.

(*Id.*, Ex. C ('828 Patent at 7:47-53.)

On August 14, 2007, the Court issued an Order construing the term "stent," as used in the Wiktor Patents, to mean "a supporting device." (Docket No. 91 (Claim Construction Order at 16:21-22); Docket No. 116 (Order Granting Plaintiffs' Motion for Reconsideration at 2:13-25).) In so doing, the Court rejected Gore's proposed construction that the term "stent" should include a "low memory metal" limitation. (Claim Construction Order at 14:15-16:10).[6] The

---

[6] In its Claim Construction Order, the Court stated that a "low memory metal" limitation was the only meaningful difference between independent Claim 14 and dependent Claim 17 of the '062 Patent. (Claim Construction Order at 14:20-21.) The reference to the '062 Patent was a typographical error, and the Court intended to refer to Claims 14 and 17 of

3

Court also concluded that Wiktor "did not disavow clearly the use of self-expanding or resilient stents," based in part on its conclusion that "Wiktor does not say resilient metal is unsuitable to achieve the object of his invention, namely a stent that expands radially." (*Id.* at 15:15-17.)

**B.     The Jervis Patents.**

The Jervis Patents are directed to medical devices, or methods for implanting such devices, that utilize shape memory alloys ("SMAs") and improvements thereon. (*See, e.g.,* BianRosa Decl., Ex. D ('957 Patent at 1:19-20).) The '957 Patent was filed on September 27, 1988. The '546 Patent was filed on April 9, 1991, and the '141 Patent was filed on June 7, 1995. It is undisputed that, at the time the first Jervis Patent was filed, a person or ordinary skill in the art would possess a degree in materials sciences or related engineering degree and have some familiarity with implantable medical devices.

As Jervis acknowledges in his patents, "[m]aterials, both organic and metallic, capable of possessing shape memory are well known." ('957 Patent at 1:23-24.) Jervis also explains that:

> [a]n article made of [a material capable of possessing shape memory] can be deformed from an original, heat-stable configuration to a second, heat-unstable configuration. The article is said to have shape memory for the reason that, upon the application of heat alone, it can be caused to revert, or to attempt to revert, from its heat-unstable configuration to its original, heat-stable configuration, *i.e.* it "remembers" its original shape.
>
> Among metallic alloys, the ability to possess shape memory is a result of the fact that the alloy undergoes a reversible transformation from an austenitic state to a martensitic state with a change in temperature. This transformation is sometimes referred to as a thermoelastic martensitic transformation. An article made from such an alloy ... is easily deformed from its original configuration to a new configuration when cooled below the temperature at which the alloy is transformed from the austenitic state to the martensitic state. The temperature at which this transformation begins is usually referred to as $M_s$ and the temperature at which it finishes $M_f$. When an article thus deformed is warmed to the temperature at which the alloy starts to revert back to austenite, referred to as $A_s$ ($A_f$ being the temperature at which the reversion is complete) the deformed object will begin to return to its original configuration.

('957 Patent at 1:23-49).)

---

the '828 Patent.

4

Jervis describes the disadvantages associated with using SMA devices for medical purposes, including the fact that "it is difficult to control the transformation temperatures of shape memory alloys with accuracy, as they are usually composition-sensitive[.]" (*Id.* at 2:32-35.)

> The combination of these factors with the limitation that (a) it is inconvenient to have to engage in any temperature manipulation, and (b) human tissue cannot be heated or cooled beyond certain relatively narrow limits ... without suffering temporary or permanent damage is expected to limit the use of SMA medical devices. It would thus be desirable to develop a way in which the advantageous properties of shape memory alloys, i.e. their ability to return to an original shape after relatively substantial deformation, could be used in medical devices without requiring the delicacy of alloying control and/or the temperature control of placement or removal needed by present shape memory alloy devices.
>
> ...
>
> I have discovered that if, in a medical device containing a shape memory alloy element which uses the shape memory property of that alloy, an element which shows the property of stress-induced martensite is used instead, an improved device results.
>
> Accordingly, this invention provides a medical device intended for use within a mammalian body, or in such proximity to a mammalian body that the device is substantially at body temperature, which device comprises a shape memory alloy element, the improvement in which comprises the substitution of an alloy element which displays stress-induced martensite at said body temperature for the shape memory alloy element.

(*Id.* at 2:43-66; *see also id.* at 3:1-6.)

## ANALYSIS

**A.   Legal Standards Applicable to Motions for Summary Judgment.**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Union States Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1212 (Fed. Cir. 1996). The burden of demonstrating the absence of any genuine issue of material fact rests with the moving party. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). Where, as here, the moving party will bear the burden of proof at trial, that party must come forth with "evidence which would entitle it to a directed verdict if the evidence went uncontradicted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *cf. Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001). In order to defeat summary judgment, the non-moving party must do

1    "more than simply show that there is some metaphysical doubt as to the material facts."
2    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-
3    moving party must set forth "specific facts showing that there is a genuine issue for trial."  Fed.
4    R. Civ. P. 56(c); *Matsushita Elec.*, 475 U.S. at 587.

"Because a patent is presumed to be valid," Gore's "evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence."  *Automotive Tech. Int'l Inc. v. BMW of North Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007) (citing *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003)).  Gore also must overcome "deference to the [United States Patent and Trademark Office's ("PTO")] findings and decisions in prosecuting the patent application.  Deference to the PTO is due '[w]hen no prior art other than that which was considered by the PTO examiner is relied on'" by the party attacking the patent's validity.  *Boston Scientific Corp. v. Johnson & Johnson*, 534 F. Supp. 2d 1062, 1068 (N.D. Cal. 2007) (quoting *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir.), *cert denied*, 469 U.S. 821 (1984)).

**B.     Evidentiary Objections.**

Medtronic objects to Exhibits G-H to the BianRosa Declaration, on the ground that the documents contain inadmissible hearsay.[7]  Gore argues that the documents are admissible under Federal Rule of Evidence 801(d)(2)(D), which provides that a statement is not hearsay if "the statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Medtronic responds that at the time Wiktor made the statements reflected in these exhibits, he was an independent contractor and not Medtronic's agent.  *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1440 (9th Cir. 1990) (finding that district court properly excluded statements where plaintiff had not established statements were made by agents as opposed to independent contractors).

---

[7]     The Court has not relied on Exhibit G to the BianRosa Declaration. Therefore, it shall not address the admissibility of the exhibit at this time.

6

1  The consulting agreement between Wiktor and Medtronic is governed by Minnesota law. (Reply Declaration of Jennifer BianRosa ("BianRosa Reply Decl."), Ex. W at 7.)  Under Minnesota law, the factors to be applied to distinguish between an independent contractor and agency relationship are "(1) [t]he right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done; and (5) the right of the employer to discharge. ... In determining whether the status is one of employee or independent contractor, the most important factor considered in light of the nature of the work involved is the right of the employer to control the means and manner of performance." *Guhlke v. Roberts Truck Lines*, 268 Minn. 141, 143 (1964).

The consulting agreement does not state that Wiktor is an independent contractor. Moreover, it provides that Wiktor agrees to consult with Medtronic "and perform development work for Medtronic in the area of vascular stents, *as directed* by Medtronic." (Bian Rosa Reply Decl., Ex. W at 2-3 (emphasis added).)  Medtronic paid Wiktor for his services and at least some of the documents Gore submits suggest that Medtronic furnished Wiktor with materials during the course of their agreement. The Court concludes that Gore has presented sufficient evidence to establish that Wiktor acted as Medtronic's agent at the time the statements were made. (*See* Docket No. 285, Gore's Motion for Leave to File Post Summary Judgment Hearing Submission, Exs. A, B.)  Further, the statements were made within the scope of Wiktor's consulting agreement.

Therefore, the Court concludes that the statements are non-hearsay and OVERRULES the objections to BianRosa Declaration Exhibits H and I. *See Metro Goldwyn Meyers Studio v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 973-74 (C.D. Cal. 2006) (noting that "statement is admissible under Rule 801(d)(2)(D) so long as it is made by an agent within the scope of agency, regardless of the precise contractual relationship between the agent and the party against whom the evidence is offered"); *cf. Beck v. Haik,* 377 F.3d 624, 639-40 & n. 4 (6th Cir. 2004) (citing, *inter alia, United States ex rel Remtech, Inc. v. National Union Fire Ins. Co.*, 2000 WL 1171139 at *3 n.4 (9th Cir. Aug. 17, 2000)) (concluding that statement by a "consultant" qualified as non-hearsay pursuant to Rule 801(d)(2)(D)).

**C.   Gore Has Not Met Its Burden to Show That the Claims of the Wiktor Patents Are Invalid.**

### 1.   Legal Standards Applicable to Enablement.

> The specification [of a patent] shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, ¶ 1 (hereinafter "Section 112, paragraph 1").

"Whether the subject matter of a patent claim satisfies the enablement requirement under [Section 112, paragraph 1] is a question of law ... based on underlying facts." *Automotive Tech. Int'l*, 501 F.3d at 1281.  The "enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *A.K. Steel*, 344 F.3d at 1244.  "The full scope of the claimed invention must be enabled." *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 999 (Fed. Cir. 2008).  Thus, if a patentee "chooses broad claim language," he or she "must make sure the broad claims are fully enabled." *Id.*

The Federal Circuit has identified several factors to consider "in determining whether a disclosure would require undue experimentation." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  Those factors include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.*  These factors are "illustrative, not mandatory.  What is relevant depends on the facts[.]  *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 2000).

### 2.   Analysis.

Gore argues that the Wiktor Patents do not enable a "self-expanding zig-zag" stent.  To support its position, Gore relies on the specifications of the Wiktor Patents and on Wiktor's statements that he tried to make a self-expanding "Wiktor stent" but failed.  Medtronic counters

1  that Gore focuses on unrecited claim elements and that Gore has not pointed to particular claim
2  language that is not enabled. The Court does not find Medtronic's argument persuasive.

3   Gore's enablement argument is premised the Court's construction of the term stent, which is broad enough to cover a self-expanding or a stent that is expanded by external means. (*See* Claim Construction Order at 14:10-16:21.) Gore correctly argues that, in light of this broad construction, the Wiktor Patents must enable the full scope of embodiments that would fall within the claims. *See, e.g., Sitrick*, 516 F.3d at 999-1000 (noting that plaintiff had argued for a claim construction that would encompass both movies and video games and concluding that patent must enable both embodiments of the invention); *Automotive Tech. Int'l*, 501 F.3d at 1282 (concluding that where district court construed claim term to include both mechanical and electronic sensors, "that full scope must be enabled"); *Leibel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007).

"An enablement analysis begins with the disclosure in the specification." *Sitrick*, 516 F.3d at 1000. Gore argues that the Wiktor Patents "teach against" self-expanding stents and cites to Wiktor's reference to his U.S. Patent No. 4,649,922, which Medtronic does not dispute is a self-expanding stent. The Federal Circuit has concluded that where a specification teaches against a particular embodiment, that fact can provide evidence that undue experimentation would be necessary. *See, e.g., Liebel-Flarsheim*, 481 F.3d at 1379; *A.K. Steel*, 344 F.3d at 1244. Wiktor acknowledges that the stent of the '922 Patent has "some drawbacks," including the fact that "the spring has a fixed diameter and as such is unable to fully conform to the inside wall of the vessel...." (*See* '062 Patent at 1:28-42.) Wiktor then notes that two prior art devices, U.S. Patent No. 4,553,545 (the "'545 Patent") and U.S. Patent No. 3,868,956 (the "'956 Patent"), teach a method of expanding the diameter of a stent. (*Id.* at 1:45-53.) He criticizes those devices because of the complexity of the methods used and because of the possibility of "blood coagulation and possible thrombosis." Wiktor's criticism of the prior art devices does not expressly relate to or encompass the materials from which those devices were made. (*Id.* at 1:54-56.)

9

In addition to the '545 Patent and the '956 Patent, Wiktor references several other prior art devices, which, like the '545 Patent and the '956 Patent, encompass self-expanding stents as well as stents that are expanded by external means. Wiktor notes that those "references describe and teach various methods of providing or otherwise offering and introducing stents of different types and designs for applications similar to the one described herein in this invention." (*Id.* at 2:10-31.) Wiktor then describes the benefits of his improved invention, which include: requiring only a "single procedure;" allowing for and "maintain[ing] a very low profile and a small frontal area, so very important for purposes of percutaneous insertion;" and having an "inherent post-expansion radial rigidity and linear flexibility." (*Id.* at 2:4-9, 2:38-41, 3:25-29.) Wiktor states that the invention is "characterized" by a "low memory metal," which assures that "the radially expanded stent stays expanded thus fulfilling its primary intent and function." (*Id.* at 3:21-24.) Wiktor also states that the use of a "flexible wire ... allows easy radial expansion and subsequent retention of the radially expanded shape well anchored within a vessel." (*Id.* at 3:35-37.)

In *Liebel-Flarsheim*, the inventors argued for and obtained a claim construction that included an injector with and without a pressure jacket. However, in the specification, they stated that "[w]ithout a pressure jacket, syringes that are able to withstand ... high pressures are expensive and therefore impractical where the syringes are to be disposed." 481 F.3d at 1379. The Federal Circuit found that critique of the prior art, in combination with the fact that the specification provided "no guidance or suggestion of how to make or use a disposable syringe for high pressure use without a pressure jacket," supported a conclusion that the claims were invalid for lack of enablement. *Id.* at 1379-80.

Similarly, in *A.K. Steel*, the inventors argued for an obtained a claim construction that encompassed two types of aluminum coating, Type 1 and Type 2. The court also noted that the claims required that the "coating wet well." 344 F.3d at 1244. The court concluded, however, that the disclosure did not enable an embodiment that used Type 1 coating, because "the specification clearly and strongly warns that such an embodiment would not wet well. In particular, the specification warns that silicon content above 0.5% in the aluminum coating

10

1  causes coating problems." *Id.*  The court found that such language "discourages
2  experimentation with coatings having more than 0.5% silicon, undue or otherwise." *Id.*  In
3  contrast, and as the Court previously noted, Wiktor does not state that the use of resilient metal
4  would be either unsuitable or impractical to achieve the object of the invention.  (*See* Claim
5  Construction Order at 15:16-17.)  Moreover, it is undisputed that self-expanding stents were
6  known in the prior art.  Thus, this is not a situation where the specification disclosed a new field
7  of art.  *See, e.g., Automotive Techs.*, 501 F.3d at 1284 (concluding that defendant met its burden
8  to show disclosure did not enable a particular embodiment of the invention based, in part, on the
9  fact that the particular embodiment was a new field and no prior art devices existed).

10  Gore also relies on Wiktor's statements that suggest he tried to create a stent that was
11  "self-expanding" but did not succeed.  Specifically, Gore submits a memorandum dated March
12  31, 1990, in which Wiktor states that "I have done some preliminary design and model work on
13  the proposed self-expanding stent, initial work indicates it will be quite difficult, but I shall not
14  give up and will continue to pursue it."  Gore also submits a letter dated May 30, 1995, in which
15  Wiktor states that "[a]fter several discussions with you on this subject, I find myself spending
16  more time dreaming and fantasizing about a self-expanding stent; hopefully those mental
17  calisthenics will develop into something tangible."  (BianRosa Decl., Exs. H-I.)

18  There is no evidence in the record that Wiktor had a degree in engineering or biomedical
19  engineering, as well as a familiarity with implantable medical devices.  Assuming that Wiktor
20  was a person of ordinary skill in the art, the fact that Wiktor had "difficulty" in creating a self-
21  expanding stent provides some evidence that further experimentation might be necessary.  *See*
22  *Liebel-Flarsheim,* 481 F.3d at 1371 (finding lack of enablement based, in part, on inventors'
23  admission that they tried, but failed, to produce a pressure-jacketless system and decided not to
24  pursue it because it was "to risky"); *A.K. Steel*, 344 F.3d at 1244 (finding lack of enablement
25  based, in part, on failure to utilize Type 1 aluminum coating at the time of filing).  However, the
26  applicable standard is whether "undue experimentation" would be required.  Gore's evidence
27  neither suggests why Wiktor had difficulty creating a self-expanding stent of the type claimed
28

11

in the Wiktor Patents nor suggests whether he could build such a stent but could not achieve other aspects of the invention.

The Court concludes that the Wiktor Patents must enable a "self-expanding" stent to satisfy the requirements of Section 112, paragraph 1. However, on this record Gore has not met its burden to establish a prima facie case of invalidity for lack of enablement. Accordingly, Gore's motion is denied on this basis. This ruling is not intended to preclude Gore from presenting additional evidence on the issue at trial.

**D.  Gore Has Not Met Its Burden to Show That the Claims of the Jervis Patents Are Invalid for Obviousness.**

Gore argues that the asserted claims of the Jervis Patents are obvious, because Jervis merely substituted an SMA displaying stress-induced martensite for an SMA displaying temperature-induced martensite in existing medical devices and achieved a predictable result.

**1.  Legal Standards Applicable to a Determination of Obviousness.**

"Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 127 S.Ct. 1727, 1743 (2008) (quoting 35 U.S.C. § 103(a)). "[T]he ultimate conclusion of obviousness is for the court to decide as a matter of law, [however] several factual inquiries underlie this determination." *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000). As set forth in the *KSR* case, those factual considerations, which should be judged objectively, are:

> the scope and content of the prior art ...; differences between the prior art and the claims at issue ... ; and the level of ordinary skill in the pertinent art ... . Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*KSR*, 127 S.Ct. at 1734 (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)); *see also SIBIA*, 225 F.3d at 1355. "The combination of familiar elements according to

12

known methods is likely to be obvious when it does no more than yield predictable results." *KSR*, 127 S. Ct. at 1739.

### 2. Analysis.

In support of its argument that the claims of the Jervis Patent are invalid for obviousness, Gore relies on three prior art references: (1) L. Delaey, *et al.*, "Thermoelasticity, Pseudoelasticity and the Memory Effects Associated with Martensitic Transformations," 9 J. Materials Science 1521-1555 (1974) ("*Delaey*"); (2) L. McDonald Schetky, "Shape-Memory Alloys," 241 *Scientific American* 5, 74-82 (Nov. 1979) ("*Schetky*"); and (3) Dr. Andrew Cragg, *et al.*, "Nonsurgical Placement of Arterial Endoprostheses: A New Technique Using Nitinol Wire," 147 *Radiology* 1, 261-63 (April 1983) ("Cragg Stent").

It is undisputed that shape memory alloys were known to display stress-induced martensite at the time Jervis filed the '957 Patent. (*See*, *e.g.,* '957 Patent at 1:50-51.) Although the Jervis Patents discuss known prior art medical devices, Jervis states that certain of these prior art medical devices had not been commercialized. (*See, e.g., id.* at 5:1-2, 5:65-66.) Jervis also explained that "the use of the shape memory effect in medical applications is attended with two principal disadvantages." (*Id.* at 2:30-32.) The first disadvantage is that it is difficult to control the transformation of SMAs displaying temperature-induced martensite with accuracy, "because they are usually extremely composition sensitive." (*Id.* at 2:33-36.) The second disadvantage is that in many SMAs displaying temperature-induced martensite, there is a large temperature differential (hysteresis) "as the alloy is transformed between the austenitic and martensitic states, so that reversing the state of an SMA element may require a temperature excursion of several tens of degrees Celsius." (*Id.* at 39-44.)

The Cragg Stent article states that the wire Dr. Cragg used "transformed over a broad temperature range..., which required flushing the introducing catheter with cold saline to minimize the transformation of the wire in the catheter." (BianRosa Decl., Ex. P at 262.) Cragg's proffered solution to overcome this difficulty was "the development of a wire with a more precise transition testimony." (*Id.*) Cragg focused on temperature to solve problems with

13

1    the art and, thus, taught away from solving this problem using an SMA displaying stress-
2    induced martensite.

3          The Court also has reviewed *Schetky* and *Delaey*. Those articles demonstrate that the
4    properties of shape memory alloys, including the interplay between temperature and stress in
5    the formation of martensite, is highly technical. Further, that interplay is reflected in certain
6    claims of the '957 Patent. (*See, e.g.,* '957 Patent at 11:17-25.) However, Gore's comparison of
7    the asserted claims to these prior art references is supported only by attorney argument. There
8    is insufficient evidence in the record for the Court to ascertain the differences between, for
9    example, subsection (b) of Claim 5 of the '957 Patent and the cited portions of the prior art
10   references. "Unsubstantiated attorney argument regarding the meaning of technical evidence is
11   no substitute for competent, substantiated expert testimony." *Invitrogen Corp. v. Clontech
12   Labs.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005). Moreover, Jervis disclosed the Cragg Stent and
13   *Schetky* references during the prosecution of the '957 Patent.[8] (*See* '957 Patent at p.2.)
14   "[D]eference is therefore due to the PTO's decision to award the patents." *Boston Scientific
15   Corp.*, 534 F. Supp. 2d at 1072 (N.D. Cal. 2007); *see also id.* at 1068.

16         Gore also argues that the claims of the Jervis Patents are invalid because when one
17   combines the teachings of the Cragg Stent article and either *Schetky* or *Delaey*, it would have
18   been obvious to substitute a shape memory alloy displaying stress-induced martensite for a
19   shape memory alloy displaying temperature-induced martensite. Medtronic argues that the
20   Court should not consider this theory, because it was not disclosed in Gore's Final Invalidity
21   Contentions. The Court agrees. Gore cites all three references in its Final Invalidity
22   Contentions. (*See, e.g.,* Wang Decl., Ex. B at 8:25-27, 9:11-13, 11:7-9.) However, in Gore's
23   chart identifying those elements of the Cragg Stent article that are present in the claims of the
24   Jervis Patents, Gore does not combine the Cragg Stent article with either *Schetky* or *Delaey*.

---

[8] Medtronic submits evidence that, during the prosecution of the '957 Patent's parent application, the Examiner rejected claims as obvious in light of *Schetky*. (Wang Decl., Ex. K.) That application, however, was abandoned and, as noted above, the Examiner allowed the claims of the '957 Patent to issue even in light of *Schetky*.

14

Gore did, however, combine the Cragg Stent article with other prior art references. (*See, e.g.,* Ex. D at 385-389.)

Gore argues that the substitution theory is a "species of obviousness," and that it disclosed "ad naseum" the prior art on which it relied. (*See* Transcript of Hearing ("Tr.") at 69:6-13.) However, Gore candidly admitted at the hearing that this particular theory developed "[a]s we were working on the motion." (*Id.* at 73:10.) Accordingly, the Court has not considered this theory. *See generally O2 Micro Int'l Ltd. v. Monolithic Power Systems, Inc.*, 467 F.3d 1355 (Fed. Cir. 2006). For the foregoing reasons, the Court concludes that Gore has not met its burden to establish a prima facie case of invalidity for obviousness. Accordingly, Gore's motion is denied on this basis.[9] Again, this ruling is based upon the record currently before the Court and is not intended to preclude Gore from presenting additional evidence on the issue at trial.

**E.      Gore Has Not Met Its Burden to Show That The Claims Of The Jervis Patents Are Invalid for Indefiniteness.**

Gore also argues that the asserted claims of the Jervis Patent are invalid for indefiniteness. Gore's argument focuses on the claim term "stress-induced martensite," which the Court has construed to mean "martensite that forms from austenite due to stress." (Claim Construction Order at 7:8-9:4.)[10] Gore does not argue that the term "stress induced martensite" is, itself, ambiguous. (*See* Tr. at 78:3-79:23.) Gore argues, however, that the Court's construction does not sufficiently delineate the metes and bounds of the claims, because one of

---

[9] Gore's argument that Claim 27 of the '546 Patent is obvious in light of prior art is based primarily on the Cragg Filter article. (*See, e.g.,* Mot. at 23:16-24:4; Appendix 1B.) However, for purposes of this motion, Gore withdrew its reliance on that reference. For this additional reason, the Court concludes that Gore has not met its burden to demonstrate that Claim 27 of the '546 Patent is invalid for obviousness.

[10] Medtronic argues that Gore's indefiniteness argument must fail because the Court was able to construe the term stress-induced martensite. That fact, however, is not dispositive. "[I]f reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) (citing *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-51 (Fed. Cir. 2008)).

15

ordinary skill in the art would not know how much stress-induced martensite must be present to fall within the claims or how to test for stress-induced martensite.

### 1. Legal Standards Applicable to a Determination of Obviousness.

Section 112, paragraph 2 provides in relevant part: "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. "Because claims delineate the patentee's right to exclude," Section 112, paragraph 2 "requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.,* what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs.,* 514 F.3d at 1249; *see also Allen Eng. Corp. v. Bartell Indus. Inc.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002) (Section 112, paragraph 2 contains two requirements: (1) the claim must set forth what the patentee regards as his invention; and (2) it must do so with sufficient particularity and distinctness).

"In determining whether the claim is sufficiently definite, we must analyze whether 'one skilled in the art would understand the bounds of the claim when read in light of the specification.'" *Allen*, 299 F.3d at 1348 (quoting *Personalized Media Communications, LLC. v. Int'l Trade Comm'n*, 191 F.3d 696, 705 (Fed. Cir. 1998)). This latter inquiry can be achieved by a "simple comparison" of the claims with the specification. *Id.* The Federal Circuit has stated that claims that are "'not amenable to construction or [are] insolubly ambiguous are indefinite." *Star Scientific, Inc.*, 537 F.3d at 1371 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)).

### 2. Analysis.

Gore relies heavily on *Halliburton*, *supra*, in support of its argument that the claims are indefinite.[11] In that case, the patent at issue, which related to oil field drilling fluids, contained

---

[11] Gore also relies on Jervis's deposition testimony. However, at this stage of the proceedings, "[a] more limited range of evidence should be considered in evaluating validity as opposed to patentability under either portion of section 112, paragraph 2, because the language of issued claims is generally fixed ..., the claims are no longer construed as broadly as is reasonably possible, and what the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope." *Solomon v.*

16

claims that were limited to "fragile gel" drilling fluids. *Halliburton*, 514 F.3d at 1246. The specification included a definition of the term "fragile gel," and on appeal the plaintiff proffered a three part definition based upon the specification. *See id.* at 1246-47, 1249. The Federal Circuit, however, upheld the district court's conclusion that the term was indefinite.

The court stated that "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Id.* at 1251. The court's reasoning was based in part on the fact that the plaintiff had failed "to identify the degree of the fragility of its invention." *Id.* at 1253. For example, although the plaintiff stated that the "gel easily transitions to a liquid state upon the introduction of force, ... and returns to a gel when the force is removed," the plaintiff did not identify "how quickly" these events had to occur to fall within the scope of the claims. *Id.* at 1254. The court, therefore, concluded that because the term "is ambiguous as to the requisite degree of the fragileness of the gel," the strength of the gel, "and/or some combination of the two," the defendant met its burden to provide clear and convincing evidence that the term was indefinite. *Id.* at 1256.

In contrast to the claim term in dispute in the *Halliburton*, the Court does not find that term stress-induced martensite is a term of "degree." *See, e.g., Star Scientific*, 537 F.3d at 1372 ("We have stated that when a word of degree is used ... the patent's specifiction must provide some standard for measuring that degree' to be definite.") (internal quotations omitted)  Jervis explains that shape memory alloys possess the shape memory quality because "the alloy undergoes a reversible transformation from an austenitic state to a martensitic state with a change in temperature ... sometimes referred to as thermoelastic martensitic transformation." (*Id.* at 1:22-23, 33-35.) Jervis then notes that "[m]any shape memory alloys ... are known to display stress-induced martensite." (*Id.* at 1:50-51.) Jervis thus distinguishes between two *forms* of martensite, martensite that is stress-induced or martensite that is temperature-induced.

---

*Kimberly-Cleark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000). The Court concludes that Jervis' deposition testimony does not assist Gore in establishing a prima facie case that the claims are indefinite.

17

This conclusion is supported by the claims, which do not require the presence of a particular amount or range of martensite. In addition, Jervis distinguished his invention over prior art inventions that utilized shape memory alloys displaying temperature-induced martensite. For these reasons, the Court concludes that the claims of the Jervis Patents "clearly distinguish what is claimed from what went before in the art." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

Gore also asserts that the asserted claims are invalid because they do not identify a method by which to test for the presence and amount of stress-induced martensite. Gore relies on *Honeywell Int'l Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332 (Fed. Cir. 2003), in support of this argument. In that case, the patent at issue related to polyethylene terephthalate ("PET") yarn, with a melting point elevation ("MPE") that occurred within a particular temperature range. *Id.* at 1334-35. The court noted that the method by which a sample of PET yarn is prepared could affect the value of the MPE. "[B]ecause the sample preparation method is critical to discerning whether a PET yarn has been produced by the claimed process, knowing the proper sample method is necessary to practice the invention." *Id.* at 1340. However, neither the specification nor the claims disclosed which method of sample preparation should be used to produce an MPE within the acceptable ranges. Accordingly, the court concluded that the term MPE, and all claims including that term, were indefinite and, therefore, invalid. *Id.* at 1339-41.

Again, the claims of the Jervis Patents do not require a particular amount of stress-induced martensite, and the Court does not find the *Honeywell* case to be on point. Rather, the asserted claims provide further guidance as to the metes and bounds of the claims by stating that the SMA display stress-induced martensite at or near body temperature. (*See, e.g.,* '957 Patent at 10:46-48, 11:66-67.) The specification explains that the temperature range for a typical mammalian body is 35º-40º Celsius. (*Id.* at 4:18.) Thus, the claims of the Jervis Patents also "clearly circumscribe what is foreclosed from future enterprise." *United Carbon Co.*, 317 U.S. at 236.

For the foregoing reasons, the Court concludes that Gore has not shown by clear and convincing evidence that the asserted claims of the Jervis Patents are invalid for indefiniteness. The Court's ruling is premised solely on the current record and, therefore, is not intended to preclude Gore from presenting additional evidence on this issue at trial. If, however, Gore has no further evidence in support of its invalidity defense based on the indefiniteness of the claims, this ruling shall be considered final.

## CONCLUSION

For the foregoing reasons, Gore's motion for summary judgment is DENIED. In light of this ruling, the Court shall reopen discovery in order for Gore to depose James Peterson. That deposition shall be completed by no later than January 31, 2009, unless the parties show good cause for a brief extension. It is FURTHER ORDERED that the parties shall appear for a status conference on **Friday, March 13, 2009 at 1:30 p.m. for purposes of setting dates for a pretrial conference and trial.**

**IT IS SO ORDERED.**

Dated: December 9, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE